# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **NAVICO INC. and NAVICO HOLDING AS,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Case No. 14-cv-303-CVE-TLW |
| ) | |
| **GARMIN INTERNATIONAL, INC., and** ) | |
| **GARMIN USA, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION AND ORDER

Before the Court is defendants' Motion for Order Issuing Letters Rogatory. (Dkt. 133). Through their motion, defendants seek information related to the use of "down scan" sonar by a water going vessel.[1] Defendants believe that Mark Atherton, the subject of the proposed letters rogatory and an employee of non-party Kongsberg Mesotech Ltd., can place the use of such sonar at a date which makes it prior art, and therefore relevant to defendants' defense.[2]

Based on the Court's review of record, including the parties' claims and defenses, the information defendants seek is clearly discoverable under Fed. R. Civ. P. 26, a conclusion which plaintiffs have not disputed. Instead, plaintiffs object to defendants' motion on three other grounds, arguing: (1) that it is untimely; (2) that the discovery sought is not necessary because it is cumulative; and (3) that the proposed letters rogatory are "over-assertive." (Dkt. 147). Defendants respond that they pursued the information they seek in as expeditious a manner as possible, that plaintiffs took affirmative actions to delay their efforts, that the discovery is necessary, and that the letters rogatory, as presented, are appropriately worded.

---

[1] "Down scan" sonar refers to the use of sonar in a manner that places the sonar head such that the sonar fan beam is perpendicular to the direction of the vessel.

[2] Plaintiffs state in their response that the motion "concerns discovery from Kongsberg Mesotech Ltd. and its employee, Mr. Mark Atherton." (Dkt. 147 at 1). To be clear, defendants are seeking a personal deposition of Atherton only.

**Background**

In late September, 2015, defendants' expert witness, Lloyd Huff, contacted Atherton, who resides in Canada. (Dkt. 134-5 at 2). In response, on September 24, Atherton emailed a number of images to Huff, explaining,

> Good to know the images made it through to you.
> The Babine Lake project was completed in 2004. Years before - back in the 80s I inspected the same bubbler system using an ROV and no sonar. Keeping a small observation vehicle from getting wrapped around the bubbler floats while live - boating on a 16' skiff was a challenge.
>
> When approached to inspect the same line in 2004, I knew the problem was going to keep position over the top of the bubbler. We had implemented a Trackplotter into the MS 1000 software a few months before so I did a series of perpendicular cuts across the line and just marked the point on the display where I could see a mid water target on a 200kHz altimeter. I joined the 5 or 6 market targets - similar to drawing a line between navigation waypoints, and they lined up to where the bubbler made landfall on each side of the lake. <u>I was fairly certain that the downward - looking fan - beam</u> 675kHz scanning sonar would pick up any irregularities in the bubbler lines ... In the end, it turned out to be the right tool for the right job.
>
> Here is another one for your files.
>
> In the book the clarity of the Amsteel rope is lost in the printing.
>
> Thanks for getting back to me, Lloyd; it really was great to receive your call.
>
> Let me know if i can ever be of assistance.

<u>Id.</u> (emphasis added). The images forwarded by Atherton are copyrighted to him personally and contain no reference to Kongsberg. (Dkt. 134-5 at 3).

Later the same afternoon, Huff replied,

> Mark, I passed the pictures on to the law firm that I am working with. The pictures blew their mind because they provided such a clear view of what I have been telling them about the long - standing possibilities associated with a downward pointing fan beam that is orientated perpendicular to the direction of boat motion.

> I believe they want to hear directly from you why you neither widely published what you were doing with the MS1000, nor did you go to lengths to hide what you were doing with the MS1000. I said simply it was a "rice bowl" issue because your work was providing you with a revenue stream. Yet, you were doing what anyone else could have done, if they has [sic] just put their mind to the task.
>
> I also believe they are excited to find someone in addition to myself who can speak to this issue.
>
> The lawyers me asked me to try and arrange a phone call with you on Monday 28 Sept between 14:00 and 15:00 Pacific time.
>
> If you are agreeable with that then we can arrange a conference call with you.

(Dkt. 134-6 at 2). Atherton agreed to speak with defendants' counsel, "I have no issue with talking to the law firm; wind me up and I love talking about sonar!" (Dkt. 134-7 at 2). The conversation with defendants' counsel occurred later that day, and defendants' counsel sent a follow up email on September 29 asking for evidence of the publication of the information conveyed by Atherton. (Dkt. 134-8 at 2).

Atherton responded on October 3 by forwarding materials he believed established a publication date in January 2006, at the latest.[3] (Dkt. 134-9 at 2). These materials appear to have been published on the Kongsberg public website and include the following statement: "The scanning sonar head was mounted such that the wide axis of the fan beam was perpendicular to the direction of the vessel." Id. Later that same day, Atherton sent another email to defendants' counsel, "Lucky day…. I found a jpeg with a 2007 time stamp!" (Dkt. 134-10 at 2). And yet another email later that evening, "These application notes have been on our website for years, and yes, I have sent them out to a pile of people. Fact is they have been in the public domain since they were written." (Dkt. 134-16 at 2).

---

[3] At the November 23 hearing, plaintiffs did not dispute that this date is early enough so as not to exclude the information provided by Atherton as being prior art.

3

At some point later, Huff had a conversation with Atherton about giving a deposition, and on the ninth, defendants' counsel wrote to Atherton,

> [Huff] mentioned that you would be amenable to a short deposition about those projects and the application notes that were created as a result. Can you please let us know if that is still accurate and when you would be available for this? Also, in the past when we have deposed employees of a company about their work, often they will want to talk to their company's legal departments before the deposition.

(Dkt. 134-11 at 3). Atherton responded, "Let me know what is involved with a deposition and I'll run it by the top dog and see if I get the green light." Defendants' counsel responded and explained, in the Court's view accurately, what would be involved in a deposition. Id. at 2.

One week later, on October 16, Atherton contacted counsel for defendants, after talking to Kongsberg's CEO, and stated that "[t]he CEO's response to the deposition was lukewarm at best..[sic]" (Dkt. 134-12). Evidently the CEO did not instruct Atherton to cease communicating with defendants' counsel; however, because he volunteered even more information in the same email,

> Another stroke of luck.
>
> I located the Triton Logging Data.
>
> Time Stamp is May 2, 2007.
>
> Google Triton Logging and have a look at their photo gallery. They bought a system about a year after the demo.
>
> This is the company I did the initial demo/trials for.
>
> They have used the same technique in South America and Asia.
>
> If you want the data files, I will e-mail them to you along with a link in how to access the program to play them back.
>
> I suspect you can't say much, but I am really curious who thinks they can patent this process – and why?

(Dkt. 134-13 at 3-4). A few days earlier, Atherton had informed defendants' counsel that he had been pointing a fan beam downward since the mid 1980's and even expressed disbelief that "someone is trying to patent the idea…." Id. at 6.

Then on October 20, Atherton informed defendants' counsel, "Our corporate lawyers are getting involved with the request…. Yeescccch. I cannot guarantee my availability next Tuesday[, October 27]. Sorry to toss a wrench into the gears."[4] (Dkt. 134-13 at 3). Thirty-four minutes later, Atherton emailed, "I just came from the CEO's office… Corporate in Norway contacted him on the weekend. Yeeeeessssccch!" Id. at 2. The following day, October 21, defendants' counsel received an email from an attorney representing Kongsberg,

> We also understand that you have requested a deposition of Mr. Atherton in connection with a lawsuit in the United States. To our understanding, though, there have been no letters rogatory issued or any action by a Canadian Court. At the present, Mr. Atherton and Kongsberg decline the request for such a deposition as originally scheduled next week.

(Dkt. 134-14 at 3) (emphasis added).[5] The same day, defendants' counsel emailed plaintiffs' litigation counsel about the Atherton deposition and specifically inquired as to whether plaintiffs' counsel had intervened to prevent the Atherton deposition. (Dkt. 134-12 at 5). On October 22, in-house counsel for Kongsberg made clear to defendants' counsel that Atherton's deposition would not be allowed to proceed on a voluntary basis. Id. at 4. On October 22, a Friday, plaintiffs' litigation counsel responded that he was "out this afternoon and tomorrow but will look in to your inquiry in due course." Id. Defendants' counsel's response later that day made clear that defendants intended to seek the assistance of the Court. Plaintiffs' counsel's email on October 26

---

[4] Defendants' counsel then informed Atherton that if counsel was involved, he needed to communicate directly with that counsel, not with Atherton.

[5] Plaintiffs have not argued that letters rogatory are required by Canadian law or that Atherton could not lawfully make himself available for the requested deposition.

and defendants' counsel's response gave no indication that an agreed resolution would be possible. Id. at 3.

Three days later, defendants filed their motion. Defendants did not seek an extension of the discovery deadline.

A number of conclusions can be reached, either directly or circumstantially, from the communications among Atherton, Huff, Kongsberg's in-house counsel, and defendants' litigation counsel. Atherton actively assisted Huff and defendants' litigation counsel and agreed to give a personal deposition on October 27. Kongsberg's CEO, although "lukewarm" regarding Atherton's deposition, expressed no initial concern with the assistance Atherton provided, and Atherton continued to provide assistance even after the CEO's "lukewarm" reaction. Kongsberg's in-house attorneys or "corporate in Norway," a day or two before October 20, decided, to Atherton's apparent dismay ("Yeeeeessssccch!"), that the deposition would not proceed, and appear to have incorrectly represented that Atherton personally "declined" to have his deposition taken. In addition, plaintiffs' litigation counsel acknowledged at the November 23 hearing that there were discussions between his clients' in-house counsel and Kongsberg's in-house counsel.

## **Analysis**

Generally, a party must show extraordinary circumstances to justify taking a deposition after the discovery deadline. See, e.g., Crawford v. United States, 2013 WL 249360, at *2 (N.D. Okla. Jan. 23, 2013). However, courts have broad discretion over their pre-trial schedules, Rimbert v. Eli Lilly and Co., 647 F.3d 1247, 1254 (10th Cir. 2011), and have recognized that a scheduling order can have an outcome-determinative effect on a case; therefore, "total inflexibility is undesirable." Summers v. Missouri Pac. R. R. Sys., 132 F.3d 599, 604 (10th Cir.

1997). A Magistrate Judge's discovery ruling is entitled to great deference and is reversible only for abuse of discretion. EEOC v. Mr. Gold, Inc., 223 F.R.D. 100, 102 (E.D.N.Y. 2004).

Here, defendants have established that although they have identified several prior art references, they have very little evidence, other than that sought from Atherton, of the use of sonar in a manner that directs a fan beam down, or perpendicular to a vessel. Plaintiffs dispute this conclusion, but when the Court addressed this specific issue with plaintiff's counsel at the November 23 hearing, he limited his argument to the fact that defendants have identified a substantial amount of prior art generally as opposed to any prior art on a downward directed fan beam. Hearing Recording; (Dkt. 147 at 4). When pressed, plaintiffs' counsel attempted to conflate defendants' Kongsberg prior art references with the evidence defendants seek from Atherton. Id. Plaintiffs also argue that defendants' expert has already relied on the information from Atherton, so there is no need to obtain Atherton's deposition. But plaintiffs' counsel also admitted that in the absence of Atherton's deposition, defendants have no admissible evidence that places the information provided by Atherton in time, a critical aspect of a prior art defense. Hearing Recording.

Thus, denying defendants the ability to take Atherton's deposition could be outcome determinative, although that conclusion is by no means certain. More importantly, it is clear that the information sought from Atherton is not cumulative.[6] Plaintiffs' second argument fails.

---

[6] Plaintiffs' "cumulative" argument is also hurt by its position that granting defendants' motion will require a new schedule, including new dispositive deadlines, expert report deadlines, and a new trial date, because plaintiffs' expert will need to consider and address Atherton's testimony in a supplemental report. Were the information sought from Atherton cumulative in the sense that it adds nothing new to this case, plaintiffs' expert would not likely need to address it and certainly would not need to do so prior to the dispositive motion deadline, as plaintiffs argue in their response. (Dkt. 147 at 3).

As to plaintiffs' third argument, that the letters rogatory are "over-assertive," if the Court ultimately grants defendants' motion, that issue will be addressed in a later hearing.

As to plaintiffs' first argument, that defendants' request is not timely, the Court finds some merit, both because defendants failed to seek an extension of the discovery deadline before that deadline passed and because the information sought from Atherton likely would prompt a meritorious request by plaintiffs to supplement their expert report.[7] As the Scheduling Order provides, "no date set by this Order can be changed except for good cause and upon written Order of this Court prior to the date scheduled." (Dkt. 97) (emphasis added). Had defendants sought an extension of the discovery deadline prior to its expiration, an extension could have been granted without violating the Scheduling Order, but doing so now would violate the plain language of the order. Nonetheless, this Court's prior precedent, as argued by plaintiffs, indicates that an extension would be warranted in the case of extraordinary circumstances. Such circumstances may exist here.

The Federal Rules of Civil Procedure contemplate the "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Rule 1 imposes a duty not only on the courts, but also on the parties. Effective tomorrow, Rule 1 will also provide that the Rules ". . . should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Id. (emphasis added). The new language of Rule 1 does not impose a new duty, rather, as the comments state, it merely emphasizes a duty that already exists,

---

[7] The record before the Court does not support plaintiffs' position that defendants engaged in "inexcusable delay" in not pursuing Atherton's deposition months ago. (Dkt. 147 at 2). The record is far more supportive of defendants' position in this regard, that they did not know Atherton had the information sought until late September 2015, when their expert spoke to him.

> Rule 1 is amended to emphasize that just as the court should construe and administer these rules to secure the just, speedy, and inexpensive determination of every action, so the parties share the responsibility to employ the rules in the same way. Most lawyers and parties cooperate to achieve these ends. But discussions of ways to improve the administration of civil justice regularly include pleas to discourage over-use, misuse, and abuse of procedural tools that increase cost and result in delay. Effective advocacy is consistent with — and indeed depends upon — cooperative and proportional use of procedure.

Fed. R. Civ. P. 1, Committee Notes on Rules—2015 Amendment.

Atherton expressed a good deal of excitement in assisting defendants and was apologetic that Kongsberg prevented him from giving a deposition. And, notwithstanding plaintiffs' contention to the contrary, the record does establish that Atherton agreed to have his deposition taken on October 27 and that Kongsberg intervened to prevent the deposition from happening, at least on a voluntary basis. Had Kongsberg not done so, the deposition would have occurred four days prior to the close of discovery and defendants' motion would have been unnecessary, along with all the related expense and the Court's time.[8]

If Kongsberg and Atherton made an independent decision to withdraw Atherton's agreement to appear voluntarily, no fault can be attributed to plaintiffs, and defendants' failure to seek an extension of the discovery deadline is fatal to their motion. If, however, plaintiffs intervened in such a way as to interfere with or discourage the taking of Atherton's deposition on October 27, then plaintiffs have engaged in behavior that is directly contrary to Rule 1, and extraordinary circumstances exist to extend the schedule so as to allow defendants to pursue Atherton's deposition through the issuance of letters rogatory.

The Court does not have sufficient information to determine whether plaintiffs violated Rule 1. Certainly, there is no indication from the record that plaintiffs' litigation counsel did so

---

[8] Plaintiffs have provided no basis to believe otherwise.

(he affirmatively represented that he did not). However, the record as detailed above provides ample circumstantial evidence that plaintiffs (as opposed to plaintiffs' litigation counsel) intervened in a way that thwarted defendants' effort to obtain Atherton's testimony voluntarily, resulting in a violation of Rule 1. Moreover, plaintiffs' litigation counsel, when given the opportunity to dispel this conclusion, did not.

Specifically, when addressing defendants' allegation, as made in their motion, that plaintiffs intervened to prevent Atherton's deposition, plaintiffs' litigation counsel simply accused defendants of "speculation," and then blamed defendants for not informing Atherton that Kongsberg owns a small percentage of plaintiffs' stock. (Dkt. 147 at 4). Plaintiffs imply that had Atherton known this fact, he never would have spoken to Huff or defendants' counsel. This argument is belied by the fact that Atherton continued to supply defendants' litigation counsel with information even after Atherton spoke with Kongsberg's CEO about a deposition and the total absence of any evidence that Huff or defendants hid the fact that they were working for defendants. It also fails to address the question.

Additionally, during the hearing, the Court asked plaintiffs' counsel what communications had occurred between Navico and Kongsberg regarding Atherton's deposition. Hearing at 2:47:55. Plaintiffs' counsel did not answer that question. Instead, he stated only that no one affiliated with plaintiffs had any communications with Atherton and that, "to the extent there were any" communications, they were between "in-house attorneys." He did not state what these communications were. He then argued that as of October 16, Kongsberg's in-house attorneys were "already questioning the deposition and indicating to Mr. Atherton that he should not proceed." Again, this response does not answer the question, but as importantly, it is not consistent with the record. The emails from Atherton indicate that Kongsberg's in-house

attorneys were not involved until October 20.[9] (Dkt. 134-13). Further, this argument misses the point, which is whether or not plaintiffs encouraged Kongsberg to cancel Atherton's deposition. Again, it appears from the record that plaintiffs may have done so. Referring again to the hearing, plaintiffs' counsel ultimately stated that they did not, but he did so in a different context.

First, he provided his own interpretation of the email correspondence between Atherton, defendants, and Kongsberg. Second, he told the Court, "<u>so</u> nothing that we did had any impact on this deposition. The people at Kongsberg decided that they didn't want the deposition to go forward and that they wanted to insist on formalities." Hearing at 2:50:45. This answer lacks any specificity. The Court will assume that plaintiffs' counsel, when he used the word "we," meant plaintiffs' litigation counsel; still, no answer to the question. Plaintiffs' counsel's lack of willingness to address the question or to identify even the nature of the discussions between the two companies leads the Court to believe that plaintiffs may have intervened or interfered with defendants' efforts to depose Atherton.[10]

---

[9] A liberal interpretation of Atherton's follow-up email could support involvement by Kongberg's in-house attorneys on October 17, at the earliest. (Dkt. 134-13 at 3). Atherton said, "I just came from the CEO's office… Corporate in Norway contacted him on the weekend. Yeeeeesssssccch!" The weekend included October 17 and 18. But, Atherton does not say anything about contact from in-house counsel in Norway, only "corporate." If plaintiffs' counsel knows that the weekend contact was by in-house counsel, his knowledge is not based on the record before the Court.

[10] In an email from Kongsberg's in-house counsel to defendants' attorney, the Kongsberg attorney declined to provide this information on the basis of privilege. It goes without saying that in order to claim the attorney-client privilege, an attorney must be giving legal advice or a client must be requesting it. The Court can think of no basis on which communications between plaintiffs' in-house counsel and Kongsberg's in-house counsel on the topic of whether Atherton should give a deposition would result in the seeking of, or giving of, legal advice from an attorney to a client. Nonetheless, the Court need not address this issue. <u>See</u> *infra.*

Fortunately, resolving this issue is not difficult. The Court will review the communications between plaintiffs and Kongsberg regarding Atherton's deposition and then render its decision on defendants' motion.

## Conclusion

Based on the foregoing, the Court orders plaintiffs, on or before December 4, 2015, at 11:00 a.m., to submit *in camera* all written communications (including all electronic communications such as emails, texts, . . .) between (1) them, or anyone acting on their behalf (including in-house counsel), and (2) Kongsberg (or its affiliated entities), or anyone acting on its behalf (including in-house counsel), with respect to the deposition of Mark Atherton. In addition, plaintiffs are to provide an affidavit or declaration detailing all verbal communications between plaintiffs and Kongsberg on this topic. No documents or information shall be withheld on the basis of attorney-client privilege or attorney work product. The submission shall be made directly to the undersigned's chambers. Plaintiffs shall file a short notice indicating compliance with this Order once the submission is made.

The Court will rule on defendants' motion after receipt of the submission and consistent with its comments during the November 23, 2015 hearing. If any party objects to the Court's ultimate ruling, or to this Opinion and Order, that party shall attach a copy of the November 23, 2015, hearing transcript to the objection. To the extent of any inconsistency between the Court's comments during the hearing and this Opinion and Order, this Opinion and Order shall govern.

SO ORDERED this 30th day of November, 2015.

_____
T. Lane Wilson
United States Magistrate Judge